IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOYCE HILTS,<br>　　　Plaintiff | §<br>§<br>§ | CIVIL ACTION _____ |
| VS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | JUDGE _____ |
| CITY OF PORT ARTHUR ISD,<br>　　Defendants | §<br>§ | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE U.S. DISTRICT JUDGE:**

Comes now Plaintiff Christine Hilts ("Plaintiff") complaining of the City of Port Arthur ("City"), and for cause would show the following:

**I. PARTIES**

1. Plaintiff is a former employee of the City in the Utility Operations Department-Water Purification, and resides in Jefferson County.

2. City is a municipality in Jefferson County, and may be served with summons herein by serving its City Manager *and* City Secretary at City Hall, 444, 4th Street, Port Arthur, Texas, 77640..

**II. JURISDICTION**

3. This court has jurisdiction pursuant to Title 28 §§ 1331, and 1343.

### III. VENUE

4.    Thew events occurred and the parties reside and are geographically located in Jefferson County, Texas.

### IV. FACTS

5.    Plaintiff  is a Black female and was born on November 5, 1968.

6.    The City is a Black dominated municipality.

7.    Plaintiff was successfully employed by the City of Beaumont in its Water Purification Division until 2004 when she quit to attend college and obtain her degree.

8.    Plaintiff was hired by the City on September 11, 2017, and obtained secondary employment -a second job-as a substitute teacher in a local school /area district.

9.    Plaintiff was supervised by Ron Burton ("Burton") (Black), Clyde Trahan ("Trahan") (Black), Jeff Wyble (White), Anthony Latiolais (White), and Garrett Elizondo (White/Hispanic), and assigned to work with Tammy White.

10.    The City's Human Resources Director is Trameka Williams ("Williams").

11.    After starting to work for the City, Plaintiff learned from White, who was dating Latiolais that Wyble and Latiolais had been co-workers at the City of Groves and both had been terminated or released from the City of Groves for allegedly "stealing time", and hired by the City's Clyde Trahan.

11.    From her training and employment, Plaintiff knew that various tests were to be

administered to the City's drinking water daily, one of which was a turbidity test which monitored the sediment in the drinking water and eliminated discoloring particles from the drinking water.

12.  Plaintiff learned from Milton Wyatt that although the maximum measurement of permitted sediment in the drinking water was 0.30, the City records were had been downwardly altered from time to time by Garrett Elizondo.

13.  Plaintiff made it known to her supervisor Elizondo that she knew of the alteration of turbidity readings and stated that she would not alter her readings.

14.  On July 10, 2021, Plaintiff and her coworker Tammy White became involved in a disagreement related to White's spraying Plaintiff's work-chair for COVID, and Tammy cleared by apology that she had not thrown food at Plaintiff; nevertheless, Wybel came and "investigated" and punished both Plaintiff and White, after their resolution.

15.  Plaintiff 's  performance was evaluated as follows: March 11, 2018 as "met job requirements" with the notation that "Ms. Hilts is enthusiastic about her job and a hard worker…" and has "struggled with leave requests and chain of command protocols";June 11, 2019, as "met job requirements" with the notation that "Ms. Hilts showed great improvement in the last three months to show ability to accept responsibility, leadership, job initiative and interest in development. I recommend permanent assignment and pay increase to Step Three"; March 11, 2019 as "phone short of job requirements." with the notation that "dependability, judgment, thoroughness deficiencies tied to an incident in which public health and safety was put at risk when she failed to provide adequate disinfection to the water supply for up to three hours. Miss Hilts has struggled somewhat

in" making operational decisions, interpreting data and making judgment calls that she should be able to make on her own after 18 months but she is making improvements."; June 11 2020, as "met job requirements" with the notation that miss hilts can use more improvement and set facts that were higher last evaluations. Ability to accept responsibility, leadership slash ability to motivate others, and trust in self development and initiative. The reason for this is due to involving supervision too much into operations rather than taking lead of knowledge acquired over the years. I recommend permanent assignment and pay increase to Step 4. Miss Hilts's strengths include a desire to do a good job. Generally speaking having a good attitude about being at work and staying busy .period her weaknesses include difficulty relying too heavily on management to make decisions she should be able to make on her own and failing to consistently interact with supervision in a professional and protective manner. I agree with Ms. Hilts evaluation."

16.   On July 10, 2021, Wybel called for his supervisor Clyde Trahan (Black), who had hired both Wybel and Latiolais into the City after their separations from the City of Groves, and Wybel recommended to Trahan that Plaintiff be given two weeks off-without pay, and made to acknowledge that it was a probationary final warning, and denied a raise she had been entitled to in June.

17.   Plaintiff unsuccessfully challenged the write-up and disciplinary action.; but on August 13, 2021, Plaintiff was surprised when without advance notice she was required to sign a "Last Chance Agreement Disciplinary Return To Work Agreement" ("Disciplinary Agreement") to keep her job.

18.   Six months later, on December 16, 2021, City Manager Ron Burton approved

Plaintiff 's reinstatement of eligibility to receive the raise which she had been entitled to receive in June 2021, but which had been apparently withheld from her during the post July 10, 2021 Disciplinary Agreement period by Wyble which was explained to be that there would be no further "verbal and physical altercation" involving Plaintiff such as occurred on July 10, 2021 with Tammy White. Coerced to sign by the fact that her job was the sole support for herself and her disabled son; that agreement contained the language supporting what Wybel explained, "..any violation of the City of Port Arthur personnel policy or repeat of the behaviors and actions giving rise to this, and related, disciplinary action will result in termination…" was explained as words restricting the Disciplinary Agreement by  Trahan, Wybel, and Elizondo to a threat or actual physical altercation  such as when she pointed her finger at White and told the woman to not throw food in Plaintiff's face again.

19.  On or about the first week of February2022, Plaintiff, while studying online for further certifications for her work at the City, learned that Latiolais had not only dated Tammy White, but had become romantically involved with Elizondo's wife who had taken up residence with Latiolais, and that Elizondo was on the City's computers checking on Latiolais' work records to see if he was up to his old tricks of stealing City time.

20.  With the loose conduct practices after starting to work for the City at the City workplace, and the common knowledge about Elizondo's wife  co-habiting with Latiolais, Plaintiff wondered why she had been unfairly targeted by Wybel regarding the July 10, 2021 matter, and went to Wybel's office and commented that she thought it had been

unfair to punish her for something she had not really done other using the expletive when her workspace had been sprayed without her consent and food had been thrown in her face by Tammy White, "…especially in light of Mr. Elizondo's suspicions that Latiolais was stealing time from the City."

21. Wybel said he didn't have time for the discussion, would look into it, and Plaintiff left his office.

22. Mr. Elizondo confronted Plaintiff and asked her why she had told on him to Wybel about looking up Latiolais; Elizondo's attitude toward Plaintiff became very cool.

23. Plaintiff is afflicted by chronic hypertension for which she takes medication.

24. On February 10, 2022, Plaintiff's niece in Dallas, and a friend were in a car/truck collision which killed her niece's friend and placed her niece in a medical comma.

25. Further, Plaintiff's sister Mary Alice Jones was very ill and in hospice in Dallas; Ms. Jones died on April 8, 2022.

26. Plaintiff texted the appropriate persons at the City at about 2 A.M. and said that because of a family emergency she had to go out of town and to place her absence on approved vacation time, and that she would call the following days during working hours to verify the City's receipt of her request and approval. Her request was approved. Mary Alice Jones died on April 8, 2022.

27. Wybel and Elizondo together formed the plan to again discipline Plaintiff and

push back for her telling on Elizondo's tracking Jeff's friend Latiolais' time, and accused Plaintiff of having gone to her nieces and sister's bedsides in Dallas without permission from Ellizondo; Ms. Lucy, secretary to the City manager heard about the meanness, and went to Trameka Williams, Director of Human resources and told her reportedly to put a stop to the plan; Plaintiff returned to Port Arthur.

28.   Early on the morning of February 27, 2022, while Plaintiff was asleep, a male coworker Robert Salinas telephoned her twice, the first he would later describe jokingly as a Butt Call.

29.   Plaintiff's hypertension was in full destabilization of Plaintiff's health and the loss of sleep disturbance because of the unwanted calls and her sister's and nieces physical conditions made Plaintiff's nocturnal interruptions more distressing.

30..   Plaintiff was scheduled to work on Sunday, February 27, 2022, but had on the previous Saturday helped her son with a Mardi Gras project to which the boy's Uncle was going to escort him.

31.   As she prepared to go to work on the 6:30 AM shift at the City, Plaintiff sensed that Robert had intentionally made the calls as a prank.

32.   Plaintiff Arrived at work, saw Anthony Latiolais at the time clock and told him that her hypertension was up and that Robert had called her to wake her up and it was a terrible trick.

33.   At 6:25 AM, the coworker and Tammy White were leaving the City building after their shift, and encountered plaintiff at the elevator.

33.   In Plaintiff's encounter at the elevator with Robert who was accompanied by co-worker Tammy White, , Plaintiff chastised Robert again, and he replied, " I don't know what's wrong with you I said I was sorry for butt dialing you it was an accident you need to stop smoking that crack."

34.   Plaintiff was shocked at Robert's unfounded accusatory remark and replied that it was Robert's brother who smoked the crack and Robert and Tammy cheerfully departed the City worksite.

35.   Plaintiff walked up the stairway and fell and hurt her knee, and became dizzy with the pain and hypertension.

36.   Plaintiff believed she could not adequately tend the City's business that day, and needed to get home, take medicine and rest until she could see the doctor the next day.

37.   Plaintiff called her supervisor Garrett Elizondo, who agreed to replace her for the day and said that Plaintiff could go to centrifuge room and if Jarred Bell was available with Latiolais, get him to replace her.

38.  Plaintiff went to the centrifuge room, for the first time, and saw Bell and Latiolais; Plaintiff told Bell what had happened to her, and with Latiolais' approval followed her out and to her post.

39. Elizondo later changed his story after being confronted by Wyble to in effect say that he had gone along with Plaintiff's being replaced by Bell, but, he had not quite yet approved the emergency substitution.

40. Wyble and Elizondo called Plaintiff , one of the call being made as she was being stopped by a policeman to render assistance to her when in distress.

41. Wyble and Elizondo decided to fire her for being absent from duty without permission from Elizondo or Wyble, but they waited until their ambush was complete.

42. Wyble contacted Trameka Williams and she said to fire Plaintiff, so on April 1, 2022, Wyble and Elizondo called plaintiff in and told her that she had left without permission and replacement.

43. The termination could not occur but for good cause in violation of the City's rules and approval of the City Manager, whose impending decision could be challenged by Plaintiff by going before a 5 person committee to make a recommendation and receiving a favorable recommendation that the City manager not fire her.

44. However, the City has a practice tantamount to a policy that employees whose supervisors stay firm with their recommendation of termination even if arbitrary and not grounded in reasoned analysis.

45. Plaintiff challenged the termination and appealed the recommendation of Wyble and decision of Trameka Williams to terminate Plaintiff to a committee, which held a hearing on June 17, 2022.

46. The City's committee has made Williams the plocymaker of the processes used by the Appeal Committee.

47. Trameka Williams who refused to allow Plaintiff  to call three rebuttal

witnesses because the City did not know in advance that those witnesses would be called.

48. The City enlarged and altered the reasons for firing Plaintiff from the reason at the time of her termination to an ambiguous and arbitrary group of "reasons" at the hearing, including the Discipline Agreement which had not been previously mentioned or supported by proof on the two witnesses called at the hearing, Wyble and Plaintiff.

49.  Plaintiff was admittedly entitled to due process and was denied procedural due process and substantive due process, in violation of the Fourteenth Amendment by persons acting under color of state law, engaged in the deprivation of Plaintiff's rights privileges and immunities under the laws of the United States.

## V.    CAUSE OF ACTION

50.   Plaintiff  was deprived of  protected interests without procedural and substantive du e process of law under the Fourteenth Amendment.

51.     Plaintiff seeks a mandatory temporary injunction to reinstate her to hwer position at the City pending trial on the merits.

## VI. PRAYER

52.  Plaintiff asks that upon final judgment Plaintiff receive a declaratory judgment that Defendant has violated rights secured to her by the Fourteentth Amendment and that she be reinstated both temporarily and permanently to her position with the City.

53.  Plaintiff prays that she be awarded attorneys fees under Title 42 § 1988, and all other releief to which she may show herself entitled.

Respectfully submitted,

By: /s/ *Larry Watts*
    Laurence Watts
    Texas Bar No. 20981000
    P.O. Box 2214
    Missouri City, Texas 77459
    Tel: (281) 431-1500
    Fax: (877) 797-4055
    larry@wattsjustice.attorney

    **ATTORNEY FOR Joyce Hilts,**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2023, a true and correct copy of the foregoing <u>Defendant Dr. Oliva's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) And 12(b)(6)</u> has been filed using the CM/ECF system, which will effectuate service on the following counsel of record:

Larry Watts
Texas Bar No. 20981000
Watts & Company, Lawyers, Ltd.
P.O. Box 2214
Missouri City, Texas 77459
Tel.: (281) 306-6801
Fax: (877) 797-4055
wattstrial@gmail.com

Brandon P. Monk
Texas Bar No. 24048668
The Monk Law Firm
4875 Parker Drive
Beaumont, Texas 77705
Phone: (409) 724-6665
Fax: (409) 729-6665
brandon@themonklawfirm.com
**Attorneys for Plaintiff**

Kimberly Fuchs
Texas Bar No. 24044140
Assistant Attorney General
Jerry S. Bergman
Texas Bar No. 24081964
Assistant Attorney General
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4195
Fax: (512) 320-0167
kimberly.fuchs@oag.texas.gov
jerry.bergman@oag.texas.gov
**Attorneys for Defendant,**
**Commissioner Morath**

/s/ *Marivious Allen*
Marivious Allen
**Attorney for Defendant,**
**Dr. Melissa Oliva**